(No. 19585.—

ANNA M. APPLEHANS *et al.* Appellees, *vs.* JOHN C. JURGENSON, Appellant.

*Opinion filed October 19, 1929.*

MONAHAN & MONAHAN, for appellant.

COBURN, KEARNEY & COBURN, for appellees.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Anna M. Applehans, Henry C. Olsen and Charles E. Nelson filed their bill in the circuit court of Cook county against John C. Jurgenson, Patrick Walsh and Carolyn Vethe to contest the last will of Christine Enga Hagenow, deceased. The complainants charged that the decedent lacked testamentary capacity and that Jurgenson exercised undue influence to procure the execution of the will. Jurgenson and Walsh filed an answer denying the material allegations of the bill. The cause was submitted to a jury

and a verdict was returned that the instrument was not the last will and testament of Christine Enga Hagenow, deceased. By a decree, rendered in accordance with the verdict, the instrument was declared void and its admission to record was set aside. From that decree Jurgenson prosecutes this appeal.

Christine Enga Hagenow became a widow in 1920, when her husband, Harry Hagenow, a police officer, died. Three years later she purchased the property known as 1519 Wicker Park avenue, in the city of Chicago. She occupied the lower portion of the house and let the upper floor to roomers, one of whom was John C. Jurgenson. There was a garage in the rear and part of it was occupied by tenants. Her income from the roomers and tenants was supplemented by a monthly pension of $55 paid her as the widow of a police officer.

A few days prior to June 8, 1926, Mrs. Hagenow went to the office of Gustave Freudenberg, the agent through whom she had purchased her home, and showed him three sheets of paper stating that she had written her will upon them and desired to have the sheets transcribed upon a typewriter. Pursuant to his direction, the work was done by his stenographer, and the typewritten instrument was delivered to Mrs. Hagenow. Later, on June 8, 1926, she requested him, by telephone, to call at her home to act as a witness to her will. When he arrived he found Virginia Lucas, one of Mrs. Hagenow's neighbors, present for the same purpose. Mrs. Hagenow produced the typewritten instrument and signed it and they in turn affixed their signatures in attestation of her execution of the instrument as her will. By this instrument she gave to her sister, Anna M. Applehans, $1000, to be paid in monthly installments of $25 each; to her step-father, Patrick Walsh, $300, payable in like installments; to her cousin, Carolyn Vethe, $100, and to John C. Jurgenson, the house and lot at 1519 Wicker Park avenue, Chicago; forty acres of land

in Baldwin county, Alabama; eight shares of preferred stock of the Davis Sewing Machine Company; two subscription agreements and all her furniture and jewelry. An expenditure of not less than $135 for a headstone on her mother's grave was directed. The unpaid portions of the legacies bequeathed to Anna M. Applehans and Patrick Walsh, in case of their deaths prior to full payment, were given to John C. Jurgenson; and in case of his death, the residue of his devise and bequest was given to Henry C. Olsen, a nephew of the testatrix. Jurgenson was nominated executor and surety upon his bond as such was waived. Mrs. Hagenow died a widow on June 30, 1926, at the age of fifty-five years. She left neither a child nor the descendant of a child and her heirs were the three complainants, Anna M. Applehans, her sister, and Henry C. Olsen and Charles E. Nelson, her nephews. On August 6, 1926, the instrument was admitted to record by the probate court of Cook county, and letters testamentary thereon were granted to John C. Jurgenson.

Appellant makes several contentions for a reversal of the decree. They may be reduced to one, namely, that the verdict and decree are against the manifest weight of the evidence. Consideration of this contention requires a statement of the substance of the evidence.

Twenty witnesses testified on the trial. The two subscribing witnesses were first called and they fixed the time and place and described the manner of the execution and attestation of the instrument. Gustave Freudenberg, one of these witnesses, further testified that he had sold property to Mrs. Hagenow and had insured her house; that she had made payments to him in reduction of the mortgage on her property, and that she appeared to him to be a strong and competent woman. Virginia Lucas, the other attesting witness, had been acquainted with her for three years and visited her once or twice a month. Both witnesses testified that they believed Mrs. Hagenow was of

sound and disposing mind and memory when she signed the instrument which she declared was her will.

Twelve witnesses were called by the contestants. The testimony of three was stricken out by the court; three others did not testify upon the question of the mental capacity of the testatrix while the remaining six, the substance of whose testimony follows, expressed the opinion that she was of unsound mind and incapable of making a will.

Mary B. Russell, who had been acquainted with Mrs. Hagenow about five years and visited her several times a year, testified that she would turn from one subject to another and occasionally, when asked a question, would gaze at the person who propounded it; that she asserted she would provide for her sister when she made disposition of her property and that she said Jurgenson often came home early and assisted her in the work about the house. The witness admitted that Mrs. Hagenow had been employed at times since her husband's death; that she had sold some real estate at a profit and that, with the proceeds of the sale and money she had saved, she had purchased other property.

Mrs. Hirschberg, and Goldie Scanlon, had been acquainted with Mrs. Hagenow for nine years. The former found her quarrelsome and given to the use of improper language, while the latter testified that she appeared to be nervous; that when some person knocked on the door she would say that probably police officers were coming for her; that at one time she said she would give her property to her crippled sister because she deserved it and at another time that she would leave all she had to Jurgenson.

Charles A. Kirkwood, a dentist, acquainted with Mrs. Hagenow for twenty-five years, testified that she came into his office one day prior to 1924, while intoxicated; that, at her request, he extracted one of her teeth, and that, complaining he had not spoken to her for a considerable period, she threw her arms about his neck. On cross-

examination Dr. Kirkwood admitted that, from his observation, Mrs. Hagenow was normal mentally; that she was generally capable of attending to her business affairs, but that he did not consider her of sound mind while she was intoxicated.

Dr. William M. Thompson performed two surgical operations upon Mrs. Hagenow in 1914, the first to remove some pelvic tumors and the second to cure an obstruction which followed the earlier operation. He attended her again in 1916 when, owing to a fall in a bowling alley, she suffered wounds of the scalp and elbow and a knee fracture. When the doctor attended her on this occasion, she was in a state of acute alcoholism. Mrs. Hagenow also had gallstones in 1916, which Dr. Thompson removed. Early in 1922 she had a disease of the kidneys and the doctor drained her abdomen twice through an incision. Dr. Thompson did not see or treat her after February, 1922. He testified that Mrs. Hagenow did not always answer his questions intelligently and that she was somewhat incoherent in her conversation. He was asked what effect alcoholism had upon the mind of a patient, and he answered that it produced a saturation of the brain cells which disorganized the mind and disturbed the intelligence. He further expressed the opinion that a person in such a condition would not be mentally competent to make a will.

Dr. A. C. Tenney, who had treated many alcoholic patients, was asked a hypothetical question embodying the physical conditions which Dr. Thompson testified he found upon his examinations of Mrs. Hagenow. Dr. Tenney expressed the opinion that a person in such a condition never recovers from the effects of the indulgence in alcoholic liquors; that while he may be competent to do many things, such as buying, selling and trading, yet he is not of sound and disposing mind because, when he makes disposition of his property by will, his emotional nature, rather than his common sense and business skill, dominates his act.

To sustain the instrument as the will of Mrs. Hagenow, the proponents called six witnesses in addition to the two who had attested its execution. The first, Dr. B. Vance Jeffries testified that he had been acquainted with Mrs. Hagenow for thirty-five years and occasionally attended her professionally; that during the eight years preceding her death, except for a period of fifteen months while they lived in the same building, he saw her two or three times a week and during the excepted period he met her each day; that he never saw her intoxicated; that she evinced no mental aberration and that he believed she was of sound mind and competent to make a will.

May Perkins, a neighbor, often visited Mrs. Hagenow during the last two years of her life. The husband of the witness had space in Mrs. Hagenow's garage and the latter personally collected the rent. Mrs. Perkins never saw Mrs. Hagenow under the influence of liquor, and through association with her, believed that she was of sound mind.

Florence Wilkie testified that she had been acquainted with Mrs. Hagenow since 1916; that both were members of the executive council of a branch of the Loyal Order of Moose and attended the semi-monthly meetings of the council together until Mrs. Hagenow died; that the latter often addressed the council and occasionally presided at its meetings, and that the witness often met her and had never seen her intoxicated. Mrs. Wilkie expressed the opinion that Mrs. Hagenow was of sound mind.

Fred Inwood, a street car motorman, had been acquainted with Mrs. Hagenow about forty years. He testified that he visited her home practically once a week; that he had seen her under the influence of liquor prior to 1922, but never since; that she always did her housework; that he noticed no change in her mental capacity and that she was of sound mind until her death.

Elizabeth Rohr, who had been acquainted with Mrs. Hagenow for upwards of fifteen years, testified that she

visited her about once a week and often played cards in her home; that she saw her at the meetings of the lodge and council of the Loyal Order of Moose; that Mrs. Hagenow took an active part in the affairs of the lodge often entering into its discussions and occasionally addressing the council; that the witness never saw Mrs. Hagenow under the influence of liquor and that she believed her to be of sound mind.

Patrick Walsh, eighty-two years of age, had married Mrs. Hagenow's mother in 1890, and had been a widower since 1911. He testified that during the last five and one-half years of Mrs. Hagenow's life he visited her two or three times a week; that he often played cards with her and Jurgenson in her home; that she kept roomers, did her own housework and personally attended to her business affairs; that she abstained from the use of liquor for three or four years prior to her death and that she was of sound mind and competent to make a will. The witness moved to Mrs. Hagenow's house shortly before she died and has lived there since with Jurgenson.

The evidence shows, appellees argue, that Mrs. Hagenow was addicted to the use of intoxicating liquors and that in consequence her mind became impaired to such an extent that she was not mentally competent to make a will. This unsoundness of mind was inferred by one witness because, she asserted, Mrs. Hagenow changed the subject of conversation, and occasionally failed to answer questions; by another, because she was quarrelsome and was given to the use of improper language, and by a third, because she appeared to be nervous, she thought a knock on the door gave notice of the arrival of police officers, and she changed her mind with respect to the disposition of her property. Dr. Kirkwood believed she was normal mentally and capable of transacting business save that he thought she was of unsound mind while intoxicated. Dr. Thompson concluded that she was incompetent to make a will be-

cause in 1916, more than eight years before she died, he found her in a state of acute alcoholism; she failed to answer questions intelligently and she was incoherent in her conversation. Finally, Dr. Tenney expressed the opinion, based upon Dr. Thompson's description and not upon personal acquaintance or observation, that Mrs. Hagenow was not sound mentally because when a person in her condition makes a will, her skill and common sense are subordinated to the emotional.

The use of intoxicating liquors does not have the effect of rendering a person incompetent to make a will unless it produces intoxication at the time the will is executed. Evidence that the testator was addicted to the habitual use of such liquors, however, is competent on the question of mental capacity. (*Pendarvis* v. *Gibb*, 328 Ill. 282). Practically all the witnesses who testified that they had seen Mrs. Hagenow make use of intoxicating liquors referred to a period which ended more than four years before the instrument was executed on June 8, 1926. Patrick Walsh and Fred Inwood, acquainted with her thirty-six and forty years respectively, had not seen her under the influence of liquor since 1921. The attesting witnesses who had been acquainted with her upwards of two years; May Perkins and Florence Wilkie, each an acquaintance for ten years, and Elizabeth Rohr and Dr. Jeffries, the former an acquaintance for fifteen years and the latter for thirty-five years, had never seen her intoxicated. During the four-year period immediately preceding her death, Mrs. Hagenow did her housework, kept roomers, collected rent from the garage, sold certain real estate at a profit, purchased other property and made payments on the mortgage. Until her death she attended the meetings of the lodge of which she was a member, took an active part in its affairs, presided over some of its meetings and occasionally addressed the executive council. These facts show that the evidence with respect to the use of intoxicating liquors had

reference to a period too remote to make it of controlling probative force and sustain the opinions expressed by eight witnesses whose acquaintance with Mrs. Hagenow was intimate and ranged from two to forty years, that she was of sound mind until she died.

Absolute soundness of mind and memory in every respect is not essential to testamentary capacity. (*Bailey* v. *Oberlander*, 329 Ill. 568; *Pendarvis* v. *Gibb, supra; Hutchinson* v. *Hutchinson*, 152 Ill. 347). A sound and disposing mind, in legal contemplation, is not inconsistent with a lack of perfect balance or a considerable degree of eccentricity. The testator, at the time he executes his will, must have sufficient mental capacity to know the natural objects of his bounty, to comprehend the kind and character of his property, to understand the nature and effect of his act, and to make a disposition of his property according to some plan formed in his mind. (*Bailey* v. *Oberlander, supra; Pendarvis* v. *Gibb, supra; Donovan* v. *St. Joseph's Home*, 295 Ill. 125; *Dowdey* v. *Palmer*, 287 id. 42). The evidence shows clearly that Mrs. Hagenow met each of these requirements, and that she was competent to make a will at the time the instrument in question was executed.

The charge that Jurgenson, the principal beneficiary under the will, procured its execution by the exercise of undue influence has no direct evidence to sustain it. Inferences to establish the charge are drawn from the facts that Jurgenson was a lodger in Mrs. Hagenow's house during the last seven years of her life; that he played cards with her guests and herself and when not otherwise employed that he assisted her in the work about the house; that, according to one witness, she referred to him as "her John" and that, according to another witness, she assigned as her reason for not following a certain course in some business transaction that "John," apparently meaning Jurgenson, dissuaded her from doing it. These circumstances are of slight if any significance to show the exercise of

undue influence. There is no evidence that Jurgenson took any part in the preparation or execution of the will. He did not accompany Mrs. Hagenow when she took the written sheets to Freudenberg, nor was he present on the later occasion when the typewritten instrument was executed and attested in her home. There is nothing to show that, in the execution of the will, Mrs. Hagenow was deprived of her free agency. The undue influence which will avoid a will must be directly connected with the execution of the instrument and operate at the time it is made. The influence must be specially directed toward procuring the will in favor of a particular party or parties, and it must be such as to destroy the freedom of the testator's will and render the instrument obviously more the offspring of the will of another or others than of his own. (*Ughetti* v. *Ughetti,* 334 Ill. 398; *Ray* v. *Koenigsmarck,* 329 id. 588; *Farmer* v. *Davis,* 289 id. 392; *Hurd* v. *Reed,* 260 id. 154; *Larabee* v. *Larabee,* 240 id. 576; *Snell* v. *Weldon,* 239 id. 279; *Wickes* v. *Walden,* 228 id. 56; *Woodman* v. *Illinois Trust and Savings Bank,* 211 id. 578; *Roe* v. *Taylor,* 45 id. 485). The evidence failed to establish these requirements. The law does not require that a testator, in making disposition of his property, shall be humane or even just. If he possesses the requisite mental capacity he has the right to make an unequal distribution of his property among his heirs or to give it entirely to strangers. (*McGrady* v. *McGrady,* 298 Ill. 129). The charge that the will was procured by undue influence exercised by Jurgenson was not sustained.

The verdict of the jury was clearly and manifestly against the weight of the evidence. The decree of the circuit court of Cook county is reversed and the cause is remanded to that court.

*Reversed and remanded.*